896 F. Supp. 1263

NSK Ltd. and NSK Corp., plaintiffs v. United States, defendant, and Federal-Mogul Corp. and Torrington Co., defendant-intervenors

Court No. 92–07–00470

(Dated August 1, 1995)

*Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe* and *Grace W. Lawson)* for plaintiffs NSK Ltd. and NSK Corporation.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Marc E. Montalbine);* of counsel: *Stephen J. Claeys, Thomas H. Fine, Alicia Greenidge* and *Dean A. Pinkert,* Attorney-Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

*Frederick L. Ikenson, P.C. (Frederick L. Ikenson, J. Eric Nissley* and *Joseph A Perna, V)* for defendant-intervenor Federal-Mogul Corporation.

*Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., John M. Breen, Lane S. Hurewitz, Myron A. Brilliant, Larry Hampel* and *Patrick J. McDonough)* for defendant-intervenor The Torrington Company.

### OPINION

TSOUCALAS, *Judge:* Plaintiff NSK Ltd, a Japanese corporation, is a manufacturer, producer and exporter of antifriction bearings ("AFBs"). Plaintiff NSK Corporation, a U.S. corporation and a wholly-owned subsidiary of NSK Ltd., is an importer and manufacturer of AFBs. NSK Ltd. (formerly Nippon Seiko K.K.) and NSK Corporation (collectively "NSK") move for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court. NSK contests the final determination of administrative review issued by the United States Department of Commerce, International Trade Administration ("Commerce"), concerning AFBs and parts thereof from Japan. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews ("Final Results"),* 57 Fed. Reg. 28,360 (1992), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom, Amendment to Final Results of Antidumping Duty Administrative Reviews ("Amended Final Results"),* 57 Fed. Reg. 59,080 (1992). Specifically, NSK objects to the following actions by Commerce with respect to Japan: (1) requiring reporting of, and including in its analysis, sales of parts "further manufactured" after importation into the United States; (2) inclusion of sample sales in the United States sales database for purposes of margin calculation; (3) treatment of home market early payment discounts as indirect selling expenses; (4) classification of plaintiffs' home market credit expenses as indirect selling expenses; (5) subtraction of early payment discounts and distributor incentive rebates from the home market unit price for purposes of conducting the cost of production test; (6) deduction of direct selling expenses from exporter's sales price rather than adding such expenses to the foreign market value; and (7) with respect to the Amended Final Results, failure to instruct the United States Customs Service ("Customs") to refund plaintiffs' excess cash deposits, plus interest. NSK contends that these errors by Commerce render the Final Results unsupported by substantial evidence and contrary to law.

Defendant-intervenors Federal-Mogul Corporation ("Federal-Mogul"), a manufacturer in the United States of antifriction bearings, and

The Torrington Company ("Torrington"), the petitioner in the original investigation, oppose NSK's challenge.

BACKGROUND

On May 15, 1989, Commerce published antidumping duty orders on ball bearings, cylindrical roller bearings, spherical plain bearings, and parts thereof from Japan, Germany, France, Italy, Romania, Singapore, Sweden, Thailand and the United Kingdom. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan,* 54 Fed. Reg. 20,904 (1989).[1]

On June 28, July 19 and August 14, 1991, Commerce initiated administrative reviews of those orders with respect to sixty-three manufacturers and exporters, including Nippon Seiko K.K. and NSK Corporation, for the period May 1, 1990 through April 30, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 56 Fed. Reg. 29,618 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 33,251 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 40,305 (1991).

On March 31, 1992, Commerce issued its Japan preliminary determinations in the second administrative reviews. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews ("Preliminary Determination"),* 57 Fed. Reg. 10,868 (1992).[2]

On June 24, 1992, Commerce published one joint final determination for nine administrative reviews. *Final Results,* 57 Fed. Reg. at 28,360.

On July 16, 1992, NSK commenced this action, challenging the Final Results with respect to Japan.

On September 24, 1992, and October 23, 1992, respectively, the Court granted Federal-Mogul's and Torrington's motions to intervene as defendants in this civil action.

---

[1] *See also Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany,* 54 Fed. Reg. 20,900 (1989); 54 Fed. Reg. 20,902 (France); 54 Fed. Reg. 20,903 (Italy); *Antidumping Duty Order: Ball Bearings and Parts Thereof From Romania,* 54 Fed. Reg. 20,906 (1989); *Antidumping Duty Order of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Singapore,* 54 Fed. Reg. 20,907 (1989); *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Parts Thereof From Sweden,* 54 Fed. Reg. 20,907 (1989); *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand,* 54 Fed. Reg. 20,909 (1989); *Antidumping Duty Orders and Amendments to the Final Determinations of Sales at Less Than Fair Value: Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom,* 54 Fed. Reg. 20,910 (1989).

[2] *See also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews,* 57 Fed. Reg. 10,859 (1992); 57 Fed. Reg. 10,862 (Federal Republic of Germany); 57 Fed. Reg. 10,865 (Italy); 57 Fed. Reg. 10,875 (Sweden); 57 Fed. Reg. 10,878 (United Kingdom); *Ball Bearings and Parts Thereof From Romania; Preliminary Results Antidumping Duty Administrative Review,* 57 Fed. Reg. 10,871 (1992); 57 Fed. Reg. 10,873 (Singapore); *Ball Bearings and Parts From Thailand; Preliminary Results of Antidumping Duty Administrative Review and Partial Termination of Administrative Review,* 57 Fed. Reg. 10,877 (1992).

On December 14, 1992, having received leave from the Court, Commerce. published amended final results, correcting certain clerical errors contained in its Final Results. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 59,080 (1992). NSK was granted leave to amend its complaint to take into account any changes in the Final Results as a result of Commerce's corrections.

On January 11, 1993, NSK filed an amended complaint contending that Commerce's Amended Final Results failed to instruct Customs to refund, with interest, the excess in cash deposits collected from NSK as a result of clerical errors in the Final Results. NSK's Amended Complaint at 9–10.

## DISCUSSION

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed. Cir. 1990).

### 1. NSK's Sample Sales:

In calculating U.S. price, Commerce included NSK's sample sales in the U.S. sales database. NSK contends that its zero price samples should be excluded from Commerce's margin calculations. According to NSK, it provides small quantities of sample bearings at no charge to prospective buyers in the United States to induce purchases. *Memorandum of Points and Authorities in Support of Motion for Judgment on the Agency Record ("NSK's Brief")* at 11. NSK contends that, after the potential purchaser completes a test performance, the customer typically disassembles the sample bearings for analysis or returns the bearings to NSK for evaluation by NSK's engineers. *NSK's Brief* at 11.

In the Final Results, Commerce rejected NSK's contention, stating:

Nothing on record here demonstrates that NSK maintains exclusive ownership of the subject merchandise after exportation to the U.S. * * *. Furthermore, at verification of NSK's ESP sales, it was determined that the line item for samples covered only the incidental expenses in delivering and packaging the sample, not the actual

cost of the sample itself. Department of Commerce Verification Report for NSK, March 17, 1992, at 8. Finally, the statute and the regulations require the Department to analyze all sales within the period of review.

*Final Results,* 57 Fed. Reg. at 28,395.

NSK argues that Commerce has previously articulated at least three standards for evaluating zero price samples. NSK contends, however, that in this review Commerce failed to identify the standard which it applied to NSK's zero price samples and failed to state its rationale for including those samples in its U.S. database. *NSK's Brief* at 22–23. NSK concedes that its indirect selling expenses reflect only incidental expenses in delivering and packaging the samples, and not the actual cost of the samples. However, NSK requests that the Court remand to Commerce to explain why NSK's zero price U.S. samples are "sales" within the context of 19 U.S.C. § 1673 (1988)[3], or that it find that the samples are not sales. *Id.* at 22–25.

Commerce agrees that the Court should remand this case so that it may further explain its treatment of NSK's zero price sales. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Defendant's Brief")* at 17.

Federal-Mogul supports Commerce's inclusion of NSK's zero-priced U.S. sales in its margin analysis as lawful and reasonable. *Response of Federal-Mogul Corporation, Defendant-Intervenor, to Plaintiffs' Motion for Judgment Upon the Agency Record ("Federal-Mogul's Brief")* at 22–24. Torrington agrees that Commerce reasonably calculated anti-dumping margins on NSK's zero-price U.S. sample sales. *Opposition of The Torrington Company to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record ("Torrington's Brief")* at 28–32.

In the event that the Court concurs with NSK and Commerce, NSK asks that the Court instruct Commerce to gather information from NSK relevant to whatever standard Commerce ultimately adopts. *Reply Brief in Support of Plaintiffs' Motion for Judgment on the Agency Record ("NSK's Reply Brief")* at 14 (citing *Federal-Mogul Corp. v. United States,* 17 CIT 1015, Slip Op. 93–180 (September 14, 1993)). NSK maintains that depriving it of the opportunity to provide informa-tion relevant to whatever standard is adopted would penalize it for not having established a record when Commerce itself did not articulate the applicable standard. *NSK's Reply Brief* at 14.

The Court disagrees with NSK that *Federal-Mogul Corp,* 17 CIT at 1020–22, Slip Op. 93–180 at 12–15 supports its proposal that Commerce gather information from NSK relevant to its ultimate standard for eva-luating sample sales. In addition, NSK admits that it was aware of at least three standards by which Commerce has previously evaluated

---

[3] The antidumping law applies to foreign merchandise that "is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673.

such samples. Therefore, NSK had sufficient basis for establishing an adequate record.

Generally, however, an administrative agency must cite the reasons for its decisions in order for the reviewing court to ascertain whether the agency has acted arbitrarily. *Nachi-Fujikoshi Corp. v. United States*, 16 CIT 606, 609, 798 F. Supp. 716, 719 (1992). Therefore, the Court agrees with Commerce and NSK that further explanation regarding the standard used to evaluate NSK's zero-priced samples is necessary. Accordingly, the Court remands this issue to Commerce to further explain its treatment of NSK's zero price sample sales.

2. *Sales of Parts "Further Manufactured" After Importation:*

For this review, Commerce required respondents to submit full Section E responses and structured its U.S. transaction base for antidumping price comparisons to include sales to the United States of "further manufactured" bearing parts. NSK objects to Commerce's inclusion of imported parts in its analysis, arguing that Commerce's decision to examine further manufactured parts was unexplained and improperly departed from its decisions in the less than fair value ("LTFV") antifriction bearings investigation and in the first administrative review. *NSK's Brief* at 18–22. NSK states that Commerce disregarded an allegedly unsubstantiated allegation by Torrington that pricing and dumping patterns for parts differ from trade in complete bearings. NSK contends that Commerce then arbitrarily decided to review imported parts despite an internal memorandum recommending that it exclude such parts from its analysis if the parts were an insignificant portion of a firm's total imports. *Id.* at 8, 10, 21.

In addition, NSK asserts that, relative to the first review where Commerce excluded imported parts because they were insignificant, in this review its monthly average value of imported parts declined, as did its imports of parts as a percentage of total imports and the imported content of bearings produced in the United States. *Id.* at 19–20.

NSK also contends that Commerce's prior treatment of imported parts, consistent with legislative history, recognized that 19 U.S.C. § 1677a(e)(3) (1988)[4] does not apply where the products ultimately sold to unrelated purchasers do not contain a significant amount by quantity or value of the imported products. *Id.* at 18–19 (referring to S. Rep. No. 1298, 93d Cong., 2d Sess. 172–73, *reprinted in* 1974 U.S.C.C.A.N. 7186, 7310). According to NSK, the parts which it imported into the United States did not account for a "significant amount" of the completed, domestically manufactured ball bearings. *NSK's Brief* at 18–19. Specifically, NSK maintains that, quantitatively, the entered value of its imported ball bearing parts represented only [ ] percent of the sales value of U.S. manufactured merchandise during the period of review

---

[4] 19 U.S.C. § 1677a(e)(3) instructs Commerce to reduce the exporter's sales price by the amount of "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise."

and, qualitatively, they added little value to the completed U.S. product. *Id.* at 3, 19–20. In addition, NSK maintains that its imported parts were often simply applied to the U.S. products but were not themselves subjected to actual further processing. *Id.* at 20. Accordingly, NSK requests that the Court find that Commerce erred in requiring respondents to report information on insignificant quantities of imported parts and require that Commerce base the dumping margin for imported parts "further manufactured" in the United States on the margin for imported finished bearings of the same class or kind of merchandise. *Id.* at 22.

In rebuttal, Commerce argues that, in the first review, its prior treatment of imported parts further manufactured was based on the need to utilize simplification techniques to reduce its workload and the reporting requirements imposed on respondents. *Defendant's Brief* at 12. Commerce suggests that "NSK conflates the rationale for the 'Roller Chain' exclusion and the rationale for the blanket exception granted to further-processed bearing parts in the first administrative review" and "tries to elevate a mere simplification procedure into an exclusion that is mandated by 19 U.S.C. § 1677a(e)(3)." *Id.* at 14. In addition, Commerce argues that its decision to broaden the U.S. transaction base for antidumping price comparisons by including further-processed bearing parts in its reporting requirements permitted it to calculate more accurate dumping margins. *Id.* at 13.

Torrington and Federal-Mogul essentially support Commerce's decision to require the reporting of all bearing parts. *Torrington's Brief* at 16–27; *Federal-Mogul's Brief* at 19–22.

It is clear that in the LTFV investigation, Commerce was concerned about simplifying procedures to meet statutory deadlines and reducing respondents' reporting burdens because of the massive number of transactions involved and the complexity of the proceedings. *See Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany ("LTFV Investigation"),* 54 Fed. Reg. 18,992, 19,027–29 (1989). It is within Commerce's discretion to utilize such simplification techniques.

Further, NSK unjustifiably relied on Commerce's past treatment of further manufactured imported parts as the past proceedings at issue demonstrate a movement toward a broader transaction base for antidumping price comparisons. For example, in the LTFV investigation Commerce "excluded from [its] calculations all ESP sales of bearings with value added in the United States." *LTFV Investigation,* 54 Fed. Reg. at 19,029. However, in the first administrative review, for bearing parts further processed into scope merchandise—Commerce granted a blanket exception from price comparisons, applying to these sales, the rate found for sales of completed bearings. Commerce explained:

> We have excluded from our price comparisons parts of bearings that were imported and further processed into finished bearings by U.S.

affiliates of foreign exporters (prior to sale to unrelated U.S. customers). Both the bearing parts and the finished bearings are of the class or kind of merchandise subject to this review. We chose the alternative of applying any dumping margins found on imports of completed bearings to imported parts of the same class or kind.

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews ("Preliminary Results, First Administrative Review"),* 56 Fed. Reg. 11,186, 11,187 (1991). Bearing parts which were further manufactured and incorporated into non-subject merchandise, were excluded entirely from the scope of the antidumping duty order pursuant to the "Roller Chain" exclusion where the manufacturer had added so much value to the product in the United States that the relative value of the imported portion of the final product was rendered insignificant. Commerce considered "those bearings otherwise subject to the order that are incorporated into nonbearing products, which collectively comprise less than one percent of the value of the finished products * * * to be outside the scope of the antidumping orders." *Preliminary Results, First Administrative Review,* 56 Fed. Reg. at 11,187. In the second review, Commerce granted some "Roller Chain" exclusions but also requested information concerning all sales of bearing parts to the United States. *See Final Results,* 57 Fed. Reg. at 28,377 (Comment 5).

In addition, Commerce clearly articulated its rationale for conducting a "further processing" analysis in this review. Commerce stated:

> Although our simplification proposals of August 1, 1991, indicated that we originally intended not to analyze sales involving merchandise further processed in the United States, we have determined based on comments received in response to our proposal that we cannot ignore information on these sales and must request appropriate data.

PR Doc. No. 188 at 1.[5] Commerce further stated:

> Section E also requests data on further processed bearings where the imported parts represent a substantial portion of the value of the finished bearings * * *. [A]ny reasons for not requiring a response for those sales would be inconsistent with the statute. Furthermore, the extent to which the value of the imported parts is "insignificant" varies among respondents * * *.
> Since further processing covers a continuum * * * we have no basis at this time for a general exemption for respondents from reporting sales of further processed bearings.

PR Doc. No. 403 at 1. In addition, Commerce stated:

> [W]e have decided to examine these sales to determine if any pricing patterns have developed as a result of our decision in the first

---

[5] Citations to documents in the country specific public administrative record are designated "PR Doc." Citations to the "general issues" public administrative record are designated "Gen. PR Doc."

review. In addition, we agree that absent an examination of these transactions, we have no basis to declare them significant or otherwise. Therefore, we have included antifriction bearing parts which are further processed after importation into the United States in our margin analysis.

*Final Results,* 57 Fed. Reg. at 28,397. The Court is of the opinion that it was reasonable for Commerce to believe that it could no longer assume that margins found for completed merchandise were representative of margins for parts which receive further processing.

Furthermore, although Commerce is not required to review every U.S. sale, the imported parts at issue are covered by the antidumping duty order and are not eligible for automatic exclusion from Commerce's analysis. When imported merchandise is sold by a related domestic party by or for the account of the exporter, the exporter's sales price ("ESP") is reduced, as appropriate, by commissions and expenses generally incurred in selling the merchandise in the United States. 19 U.S.C. § 1677a(e) (1988). Where the imported merchandise has also undergone further manufacturing or assembly, the increased value, including material and labor resulting from a process of manufacture or assembly performed post-importation, is to be subtracted from the ESP. *See* 19 U.S.C. § 1677a(e)(3). The legislative history of 1677a(e)(3) evinces an intent that the antidumping law cover further processed merchandise. Excepted are manufactured or assembled products which contain less than a significant amount of the imported merchandise. To this effect, the House Report states:

> This amendment provides that whenever merchandise subject to an antidumping investigation or finding is imported by a person or corporation related to the exporter, i.e., an exporter's sales price situation, *and the merchandise is changed by further process or manufacture so as to remove it from the class or kind of merchandise involved in the proceeding before it is sold to an unrelated purchaser, such merchandise will not escape the purview of the law,* but appropriate adjustments for the value added will be made to arrive at an exporter's sales price.
>
> Your committee intends that this amendment shall be applicable *only if the manufactured or assembled product that is sold to an unrelated person contains more than an insignificant amount of the imported merchandise.* It would distort the purpose of the Antidumping Act to render section 204 applicable to a product sold in the United States that had no, or only the slightest, physical relationship with the imported merchandise.

H.R. Rep. No. 571, 93d Cong., 1st Sess. 70 (1973) (emphasis added). *See also,* S. Rep. No. 1298, 93d Cong., 2d Sess. 172–73 (1974). In this case, NSK has not demonstrated that it is entitled to the "Roller Chain" exclusion. In addition, the Court is unpersuaded by NSK's argument that some of its imported parts were merely "applied" to the U.S. product but not further processed. In *Daewoo Elecs. Co. v. United States,* 15 CIT 124, 135–36, 760 F. Supp. 200, 210 (1991), the court addressed

whether the cost of replacing brand name plates on imported television receivers with private brand name plates was a post-importation U.S. value-added expense eligible for deduction from ESP pursuant to 19 U.S.C. § 1677a(e)(3). The court stated:

> The Court is of the opinion that the work of replacing name plates falls literally within the meaning of the statutory terms and that it would not be in accordance with the statute to develop additional standards for the substantiality of manufacturing or assembling work. The affixing of labels *is part of the process of assembly* at the very least *and its relative importance in that process should not be the determinant of how it is to be accounted for.*

*Daewoo Elecs.,* 15 CIT at 135–36, 760 F. Supp. at 210 (emphasis added). Similarly, NSK's "application" of imported parts to otherwise domestically-produced bearings falls within the literal meaning of the statute and was subject to a "further-manufactured" analysis. *See also Koyo Seiko Co. v. United States,* 18 CIT 740, 746, 861 F. Supp. 108, 114–15 (1994) (Japan-made components placed in a box with another component to be sold as a tapered roller bearing set qualify as additional material or labor and a "process of assembly" requiring an adjustment for further manufacturing after importation pursuant to 19 U.S.C. § 1677a(e)(3)).

In sum, Commerce's decision in the second administrative review to require the reporting of all bearing parts and its analysis of such parts was reasonable, supported by substantial evidence and otherwise in accordance with law.

3. *Early Payment Discounts:*

Commerce chose not to directly adjust foreign market value for NSK's early payment discounts and, instead, classified these home market expenses as indirect selling expenses. In the Final Results, Commerce stated:

> The Department has treated home market discounts, rebates and price adjustments as direct expenses if they could be traced on a transaction-specific basis. This includes adjustments that were incurred as a fixed and constant percentage of sales price over all sales and were reported on a customer-or product-specific basis. If these adjustments were not fixed and constant but reported on a customer-specific basis, they were treated as indirect expenses. If the discounts, rebates and price adjustments could not be traced on a customer-specific basis, no adjustment was made. Although we allowed customer-specific allocations on home market sales in the first reviews, we have reconsidered our position and decided to allow only price adjustments which were tied to specific sales under comparison. In this way, we avoid applying reductions to FMV for sales that did not actually incur those reductions.

*Final Results,* 57 Fed. Reg. at 28,400. Commerce further stated:

> The Department generally makes a direct selling expense adjustment for discounts reported on a transaction-specific basis. See

Final Determination of Sales at Less than Fair Value; Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, 55 FR 18992, 19056 (1989). *Since NSK allocated this expense on a customer-specific basis but did not link it to the specific sales under consideration so that its amounts could not be determined, we treat it as an indirect selling expense.*

*Id.*, 57 Fed. Reg. at 28,404 (emphasis added).

NSK believes that its early payment discounts warranted a direct adjustment to FMV because its allocation methodology was based on actual expenses and sales records. *NSK's Brief* at 25–27. NSK argues that every one of its sales of the subject merchandise to unrelated distributors in the home market was eligible for one of five, pre-determined discount percentages, depending on how quickly payment was received. NSK contends that there is no meaningful distinction between distributor-specific discounts granted according to a fixed schedule of discount percentages and those granted as a fixed percentage of sales. *Id.* at 26–29. NSK maintains that its methodology for accounting for discounts was functionally identical to the one approved by the court in *Smith-Corona Group, Consumer Prods. Div., SCM Corp. v. United States,* 713 F.2d 1568, 1580 (Fed. Cir. 1983), *cert denied,* 465 U.S. 1022 (1984). *Id.* at 27.

Commerce argues that the allocation of discounts or price adjustments to all sales distorts the actual price of each specific sale. *Defendant's Brief* at 19. Commerce explains that, where discounts are averaged over all sales, sales for which discounts were incurred are allocated a lesser portion of the discount than was actually incurred and sales for which no discount was incurred are, nonetheless, allocated a portion of total discounts. *Id.*

In *Smith-Corona Group,* 713 F.2d at 1580, the Court of Appeals for the Federal Circuit (the "CAFC") stated that, in order for rebates (or in this case, discounts) to qualify as direct costs to be subtracted from FMV, they must have been actually paid on all of the sales under consideration and allocated on the basis of actual cost and sales figures. *Koyo Seiko Co. v. United States,* 17 CIT 975, Slip Op. 93–176 at 7 (September 9, 1993). *See also Torrington Co. v. United States,* 17 CIT 951, 960, 832 F. Supp. 393, 401 (1993); *Torrington Co. v. United States,* 17 CIT 922, 934, 832 F. Supp. 379, 389 (1993). Consistent with that position, the Court has upheld, for example, Commerce's treatment of post-sale price adjustments as indirect selling expenses where the price adjustments could not be directly correlated with sales of the subject merchandise using verified cost and sales information. *Koyo Seiko Co.,* 17 CIT at 978, Slip Op. 93–176 at 7 (post-sale price adjustments, rebates and warranties); *Koyo Seiko Co. v. United States,* 16 CIT 539, 542–43, 796 F. Supp. 1526, 1530 (1992). However, the Court has cautioned that home market discounts paid on out-of-scope merchandise may not be used in calculating deductions of expenses from FMV for in-scope merchandise. *Torrington*

*Co.,* 17 CIT at 961, 832 F. Supp. at 402 (citing *Torrington Co. v. United States,* 17 CIT 199, 217–18, 818 F. Supp. 1563, 1579 (1993) (rebates)). *See also Torrington Co.,* 17 CIT at 964, 832 F. Supp. at 378.

In *Torrington Co. v. United States,* 17 CIT at 960, 832 F. Supp. at 401, the Court recognized that the statute and Commerce have a preference for actual expense information as opposed to allocated information. The Court explained that Commerce:

> generally gives respondents an incentive to provide [Commerce] with actual expense information. [Commerce] does this by classifying actual expense information in a way which gives greater benefit to the respondent and classifying allocated information in a way which gives a respondent less benefit. This can lead to differing treatment of the same kind of expenses in the calculation of USP and FMV.
>
> A respondent benefits by having home market expenses characterized as direct because generally FMV will be adjusted only for direct expenses. 19 U.S.C. § 1677b(a)(4)(B) (1988); *Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 1037–38 (Fed. Cir. 1985). If the respondent fails to meet the standard for receiving a direct adjustment to price for its home market expenses, the expense will be treated as an indirect expense because this treatment is adverse to the respondent. 19 C.F.R. § 353.56(b)(2) (indirect selling expenses deducted from FMV only in relation to ESP transactions and only up to amount of indirect selling expenses deducted from USP). Allocated expenses in the U.S. market are treated as direct expenses because direct expenses will be deducted from all USP transactions which will, therefore, reduce USP and potentially increase dumping margins. 19 U.S.C. § 1677a(d)(2)(A) (1988). If these expenses were treated as indirect expenses, they would only be deducted from USP in regard to ESP transactions and will, therefore, reduce USP and potentially increase the dumping margin only for ESP transactions. 19 U.S.C. § 1677a(e)(2) (1988). Therefore, treatment of these expenses as indirect expenses would destroy any incentive a respondent has to provide [Commerce] with actual expense information.

*Torrington Co.,* 17 CIT at 960, 832 F. Supp. at 401. *See also Torrington Co.,* 17 CIT at 934, 832 F. Supp. at 389–90. The Court has affirmed Commerce's method of providing an incentive to respondents to provide actual expense information. *NSK Ltd. v. United States,* 18 CIT 94, 98, 843 F. Supp. 1503, 1505 (1994); *Torrington Co.,* 17 CIT at 961, 832 F. Supp. at 402; *Torrington Co.,* 17 CIT at 935, 832 F. Supp. at 390. *See also Timken Co. v. United States,* 11 CIT 786, 804, 673 F. Supp. 495, 512–13 (1987).

Clearly then, discounts are deductible from FMV if the actual expense information is reported on a transaction or product-specific basis. 19 U.S.C. § 1677b(a)(4)(B). NSK's early payment discounts, however, were not reported on these bases.

It is also clear that discounts paid on subject merchandise can be allocated over all sales of the merchandise as long as discounts paid only on

the subject merchandise are used to calculate the per-unit amount of discount to be deducted, and the discounts "can be directly correlated with specific merchandise using verified cost and sales information." *Smith-Corona,* 713 F.2d at 1580. The standard which must be met in order for home market discounts which have been allocated on a customer-specific basis to be classified as direct selling expenses was detailed by the Court in *Torrington Co.,* 17 CIT at 961, 832 F. Supp. at 402, where the Court explained:

> If a respondent is unable to provide [Commerce] with transaction-specific or product-specific discount amounts, *[Commerce] must look to the information provided by the respondent to determine if the reported allocated discounts were only made on and allocated to sales of the subject merchandise and can be tied to verified cost and sales data. In order for [Commerce] to accept discounts or rebates allocated on a customer-specific basis as direct costs, the percentage amount of each discount or rebate paid must be the same for each type of the subject merchandise sold and the total amount of discounts or rebates paid to each customer must be allocated over all sales of the subject merchandise made to that customer.* If this relationship is not shown to the satisfaction of [Commerce], but the aggregate amounts of discounts paid on the subject merchandise have been verified, the discounts are to be treated as indirect selling expenses. *Koyo Seiko,* 16 CIT at 541, 796 F. Supp. at 1530.

(emphasis added). *See also Torrington Co.,* 17 CIT at 935, 832 F. Supp. at 390. In the case at bar, NSK's early payment discount percentages varied according to the time period of the review period. *See* PR Doc. No. 314. This Court has found early payment discounts to be properly classified as indirect expenses when they have been reported on a customer-specific basis and varied from sale to sale depending on the number of days after shipment that payment was made. *NSK Ltd.,* 18 CIT at 96, 843 F. Supp. at 1505.

The methodology used by NSK is distinguishable from the one approved in *Smith-Corona,* 713 F.2d at 1568. In *Koyo Seiko,* 16 CIT at 542, 796 F. Supp. at 1530, this Court held that Commerce's treatment of certain post-sale price adjustments as indirect expenses was proper and distinguished the facts of *Smith-Corona,* stating:

> [T]he rebates in *Smith-Corona* were granted as a straight percentage of sales, regardless of the models sold. *They did not vary from sale to sale* and product to product as did the post-sale price adjustments at issue in this case.

(Emphasis added). NSK's discounts differed between sales to the same customers and, therefore, were not like the rebates in *Smith-Corona.* It is apparent, in this case, that Commerce could not assume that any particular NSK customer qualified for any particular discount amount.

4. *Home Market Credit Expenses:*

During the period of review, NSK incurred credit expenses associated with delays in payment for home market sales. Commerce rejected NSK's credit expense, stating:

> As noted in the Final Results of Administrative Review; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Republic of Germany, 56 FR 31724 (July 11, 1991), the Department will not accept credit expenses not reported, at a minimum, on a customer-specific basis or some reasonable equivalent. In fact, the Department's preference remains for sales-specific reporting of this expense. NSK failed to report home market credit expense on a customer or transaction-specific basis. Therefore, we have disallowed NSK's entire home market credit expense claim. As the best information available, we have allowed only the minimum credit expense adjustment based on the least favorable terms of payment to all home market customers. We have applied this reporting requirement consistently for all companies under review in these proceedings.

*Final Results,* 57 Fed. Reg. at 28,405. Objecting to Commerce's disallowance of an adjustment to foreign market value ("FMV") for the claimed credit expense, NSK asserts that its computer records did not permit transaction or customer-specific calculation of credit expenses. *NSK's Brief* at 6. NSK explains that, consequently, it calculated this expense by allocating total home market credit expenses over each transaction. *Id.* To emphasize the alleged impropriety of Commerce's decision not to adjust FMV, NSK points out that, in various prior administrative reviews of AFBs and tapered roller bearings ("TRBs"), Commerce repeatedly found its allocation of home market credit expenses to be reasonable. *Id.* at 2–3, 6–7, 17. NSK suggests that Commerce may not now depart from its consistent prior practice and requests that the Court instruct Commerce to deduct NSK's home market credit expenses from FMV. *Id.* at 14 (citing *Shikoku Chems. Corp. v. United States,* 16 CIT 382, 388, 795 F. Supp. 417, 421–22 (1992)). In the alternative, NSK asks the Court to instruct Commerce to treat its home market credit expenses as indirect selling expenses. *NSK's Brief* at 17. NSK believes that this would be appropriate because its credit expense figures are derived directly from its ledgers for accounts and notes receivable and its credit expense is based on the actual short-term borrowing rates incurred by NSK Ltd. *Id.*

Commerce disagrees and argues that it is not prohibited from now adopting a more accurate methodology merely because, in the past, it accepted less accurate reporting, particularly where it explicitly warned NSK in the first review that its reporting methodology would be unacceptable in the second review. *Defendant's Brief* at 6–7.

Commerce is directed by 19 U.S.C. § 1677b(a)(4)(B) to adjust FMV by differences in circumstances of sale when they have been established to Commerce's satisfaction. The Federal Circuit has held that an adjust-

ment to FMV for differences in circumstances of sale is appropriate where the value determination is directly correlated with specific in-scope merchandise on the basis of actual costs. *Smith-Corona,* 713 F.2d at 1580. Accordingly, section 353.56(a)(1) of Commerce's regulations states: "In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared * * *. In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared." 19 C.F.R. § 353.56(a)(1) (1992).[6]

Direct selling expenses are incurred with respect to specific transactions. Credit, for example, is a selling expense which is only incurred when credit is extended under the terms of sale. Because credit expense is a direct expense, it should be tied to the transaction for which it was incurred. In this review, because of the high volume of transactions involved, Commerce accepted reporting on a customer-specific basis.

In its final determination in the first review, Commerce stated:

> The Department prefers to have credit calculated on a transaction-by-transaction basis. However, given the massive number of transactions in these reviews, we consider calculations based on average credit days outstanding on a customer-specific basis to be reasonable * * *.
>
> We also used * * * NSK's credit costs, as reported, for these final results. Although credit expenses for NSK's home market sales * * * were *not* calculated on a sale-specific or customer-specific basis, we have accepted the reported credit costs * * *. [H]owever, with respect to the reporting of credit expense, this review is an exception to ordinary Department practice. *In the future, in keeping with Department practice, credit expenses should be reported, at a minimum, on a customer-specific basis.*

*Antifriction Bearings (Other Then Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review,* 56 Fed. Reg. 31,692, 31,724 (1991) (emphasis added). The Court upheld the exception which Commerce made in the first review. *See Torrington Co.,* 17 CIT at 199, 818 F. Supp. at 1563. In *Torrington,* the Court held that, given the heavy burden imposed upon Commerce, it was reasonable for Commerce to make an exception to its preferred reporting requirements. *Torrington Co.,* 17 CIT at 221, 818 F. Supp. at 1580. However, the Court recognized that the methodology used in that case, "may not be absolutely perfect, or possibly the best method [Commerce] could have used." *Id.* at 221, 818 F. Supp. at 1580. Therefore, the Court disagrees with NSK that Commerce must adhere to its prior reporting methodology, especially where Commerce is striving for more accuracy.

In addition, the Court observes that Commerce explicitly warned NSK, on July 11, 1991, fully three months prior to NSK's October 15,

---

[6] Differences in credit terms are specifically listed as one of the differences for which Commerce will normally make an allowance. *See* 19 C.F.R. § 353.56(a)(2) (1992).

1991 submission of its home market response,[7] that its prior reporting method would be unacceptable in the second administrative review. Commerce's questionnaire for the second administrative review explicitly reiterated Commerce's new requirement. *See* Gen. PR Doc. No. 26 at 28. NSK's deficiency response indicates the outside time parameters within which it could have submitted the requested expense information. *See* PR Doc. No. 608 (NSK's deficiency request response, dated February 7, 1992, responding to Commerce's January 15, 1992 requirement that it recalculate its credit expenses).

Further, *Shikoku Chems.*, 16 CIT at 382, 795 F. Supp. at 417, which NSK cites for the proposition that Commerce must adhere to its prior decisions, dealt with an attempt by Commerce to modify its methodology in the advanced stages of an antidumping proceeding. At issue, specifically, were the fifth and sixth administrative reviews of *Cyanuric Acid and its Chlorinated Derivatives From Japan,* 56 Fed. Reg. 19,338 (1991). The respondent's dumping margins for the previous three consecutive periods of sales had been *de minimis.* In the fifth and sixth administrative reviews, however, Commerce altered its methodology for calculating home market packing costs, resulting in barely above–*de minimis* margins. *Shikoku Chems.*, 16 CIT at 383–84, 795 F. Supp. at 418. Moreover, Commerce's new calculation was based on information which was requested for the first time at verification. *Id.* at 387, 795 F. Supp. at 421. In this factual context, the court found Commerce's action unsupported. Importantly, in *Shikoku,* plaintiffs established their reliance on Commerce's previous methodology consistently applied in several reviews. The court concluded that it was "simply too late to mandate another three years of administrative reviews because of a last minute 'improvement' in Commerce's methodology." *Id.* at 388, 795 F. Supp. at 422. In distinct contrast to the facts in *Shikoku,* this case concerns only the second administrative review and NSK was afforded notice regarding an impending stringency in Commerce's reporting requirement. NSK does not claim that its margins would be reduced to *de minimis* levels or eliminated by grant of the claimed credit expense. In sum, none of the unusual factors that were present in *Shikoku* are present here.

In addition, the Court declines to grant NSK's requested alternative remedy. At best, NSK's credit claim reflects the aggregate expense of extending credit on all of its home market sales—an amount which may far differ from actual individual credit expenses incurred on sales of AFBs.

Accordingly, the Court sustains Commerce's rejection of NSK's home market credit expenses in the calculation of foreign market value as supported by substantial evidence and in accordance with law.

---

[7] *See* PR Doc. No. 314.

5. *Calculation of Adjusted Price for Below Cost Test:*

In the Final Results, Commerce stated that "price adjustments treated as expenses and included in the COP calculation should not be subtracted from unit price for the purposes of conducting a cost test." *Final Results,* 57 Fed. Reg. at 28,418. However, in making the statutorily mandated comparison of home market price and the cost of production ("COP") for NSK, Commerce subtracted early payment discounts and distributor incentive rebates from the home market unit selling price for the purpose of determining whether merchandise was sold in the home market at less than the cost of production.

Commerce acknowledges that Exhibit C-3, which was attached to NSK's Section C response concerning home market sales, indicates that NSK's home market selling, general and administrative ("SG&A") expenses included early payment discounts and distributor incentive rebates. *Defendant's Brief* at 23. However, Commerce asserts that Exhibit D-27, which was attached to NSK's February 7, 1992 Section D deficiency questionnaire response, detailing NSK's cost of manufacturing, sales expenses, and general and administrative ("G&A") expenses, *excluded* the discounts and rebates at issue. According to Commerce, this more recent information submitted in response to inquiries about the calculation of COP is more reliable and indicates that NSK's discounts and rebates were not included in NSK's COP. *Defendant's Brief* at 23–24.

NSK maintains that the factual premises for Commerce's conclusions are simply wrong. According to NSK, its February 7th supplemental response demonstrates that its discounts and rebates are included in its COP. NSK claims that the totals contained in Exhibit D-27 and the SG&A totals contained in Exhibit C-3, match exactly. *Reply Brief in Support of Plaintiffs' Motion for Judgment on the Agency Record ("Plaintiffs' Reply")* at 15. In addition, NSK maintains that Exhibit D-27 was created for the Japanese government, not for Commerce, and was filed in response to Commerce's supplemental question about machine cycle time and not in response to a question about discounts and rebates. *Id.* at 16.

The Court disagrees with NSK. There is no dispute that NSK's October 15, 1991 Section C response concerning home market sales indicates that discounts and rebates were included in NSK's home market SG&A expenses. *See* PR Doc. No. 314, Reel 5, Frame 723, Exhibit C-3. In addition, NSK's October 21, 1991 Section D response discussing general and administrative expenses referred Commerce back to NSK's Section C response. *See* PR Doc. No. 333, Reel 5, Frame 2221. However, Exhibit D-27, submitted with NSK's February 7, 1992 Section D deficiency response, is identified as a "Detailed List of Costs of Manufacturing, Sales Expenses and G&A." P.R. Doc. No. 608, Exhibit D-27, Reel 8, Frame 862. It is reasonable to conclude that a "detailed list" would be comprehensive and complete with respect to the noted categories. In addition, Exhibit D-27 was submitted to Commerce. Further, that it

may have been created for the Japanese government does not satisfactorily explain the disparity between NSK's Section C response and the Section D deficiency supplemental response. The Court also disagrees with NSK that the SG&A totals contained in Exhibit C–3 and Exhibit D–27, match exactly.

The burden of proof for establishing entitlement from Commerce to an adjustment rests with the respondent. It has access to the information. *Timken Co.,* 11 CIT at 804, 673 F. Supp. at 513. *See also Timken Co. v. United States,* 18 CIT 486, 490, 852 F. Supp. 1122, 1126 (1994). Moreover, "if these investigations are to be successful, parties must submit data promptly, and be very clear as to what the data indicates." *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 24, 704 F. Supp. 1114, 1124 (1989), *aff'd,* 901 F.2d 1089 (Fed. Cir. 1990). NSK submitted information to Commerce which was contradictory. Therefore, Commerce was justified in assuming that discounts and rebates were not SG&A expenses included in COP and had to be deducted from home market unit price.

Thus, Commerce's removal of NSK's early payment discounts and distributor incentive rebates from home market unit price before conducting the cost of production comparison was based on substantial evidence on the record and was otherwise in accordance with law.

### 6. NSK's Direct Selling Expenses in the United States:

In this review Commerce deducted NSK's direct selling expenses incurred in the United States from U.S. price for all exporter's sales price transactions instead of adding such expenses to the foreign market value. On March 19, 1993, NSK moved for a Writ of Mandamus directing Commerce to (1) recalculate NSK's cash deposit rates to conform with this Court's repeated instructions that direct selling expenses should be added to foreign market value rather than deducted from U.S. price in exporter's sales price transactions; (2) publish an amended final determination in the Federal Register within 21 days incorporating the results of the recalculation; and (3) instruct Customs to refund with interest any excess cash deposits paid by NSK as a result of Commerce's failure to adjust foreign market value. NSK also moved for an Order to Show Cause why the writ should not be issued. NSK now incorporates, by reference, the arguments made in its *Memorandum of Points and Authorities in Support of Motion for Writ of Mandamus* and the facts set out in its *Affidavit in Support of Plaintiffs' Motion for an Order to Show Cause and Motion for a Writ of Mandamus,* and requests that judgment be granted on this claim at this time. *NSK's Brief* at 2.

Since the Court issued its decision, *NSK Ltd. v. United States,* 17 CIT 500, Slip Op. 93–92 (June 3, 1993), denying NSK's request for a Writ of Mandamus, the CAFC addressed Commerce's practice of deducting

direct selling expenses from exporter's sales price rather than adding such expenses to the foreign market value. The CAFC observed that:

> Commerce's practice evidences an attempt to make mirror-image adjustments to foreign market value and exporter's sales price so that they can be fairly compared at the same point in the chain of commerce. The procedure is as follows: In an exporter's sales price transaction, after an initial exporter's sales price is calculated, that value is adjusted, *inter alia,* pursuant to section 1677a(e)(2) by deducting therefrom all selling expenses (both direct and indirect) incurred in making U.S. sales. Then, in determining an initial foreign market value, appropriate sales are identified in the home market or third country pursuant to 19 U.S.C. § 1677b(a). Next, the initial foreign market value is adjusted, *inter alia,* by deducting therefrom a "circumstances of sale" amount to account for "any difference between the United States price and the foreign market value," 19 U.S.C. § 1677b(a)(4), for example, direct selling expenses incurred in making home market sales. In this way, the section 1677b(a)(4) adjustment to foreign market value counterbalances the section 1677a(e)(2) adjustment to exporter's sales price. As a result, the two parameters may be compared on equivalent terms.

*Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1573 (Fed. Cir. 1994). In addition, the CAFC stated:

> Nothing in the plain language or the legislative history of the Antidumping Act precludes Commerce's approach of adjusting exporter's sales price by deducting therefrom certain direct selling expenses incurred in the United States. Indeed, Commerce's stated rationale for its approach is well within the bounds of reasonableness. Moreover, because we recognize that Commerce is "the 'master' of the antidumping law, worthy of considerable deference," *Daewoo Elecs.,* 6 F.3d at 1516, we defer to its approach.

*Koyo Seiko Co.,* 36 F.3d at 1575.

As the CAFC has held that Commerce's practice of deducting direct selling expenses from U.S. price for exporter's sales price transactions rather than adding such expenses to the foreign market value is reasonable and in accordance with law, the Court affirms Commerce on this issue. *See SKF USA Inc. v. United States,* 19 CIT 654, Slip Op. 95–85 (May 8, 1995); *SKF USA Inc. v. United States,* 19 CIT 625, Slip Op. 95–80 (May 2, 1995).

### 7. *NSK's Excess Cash Deposits:*

NSK requests that this case be remanded to Commerce to instruct Customs to refund, prior to liquidation, excess cash deposits of antidumping duties which were collected due to certain clerical errors in the Final Results. *NSK's Brief* at 31–34 (citing 19 U.S.C. § 1520(a)(4) (1988)). NSK seeks this refund for the period between June 24, 1992, the date that the Final Results were published, and December 14, 1992, the date that the Amended Final Results were published. *NSK's Brief* at 31–34. NSK also seeks payment of interest on the excess cash deposits

collected, calculated from the date of payment to the date of refund. *Id.* at 34. NSK cites 19 U.S.C. § 1520(c) and (d) (1988) for support. *Id.*

Commerce admits that it had previously denied NSK's request for a refund because it believed that a party is not harmed by the denial of a refund as excess deposits are returned with interest at liquidation. *Defendant's Brief* at 25. Commerce has reconsidered and now asserts that, although 19 U.S.C. § 1520(a)(4) does not require, it does authorize, the refund of excess cash deposits of antidumping duties which were collected due to clerical errors. Commerce now agrees that some situations may justify the refund of excess cash deposits collected due to clerical errors. However, Commerce maintains that it has not had an opportunity to establish when these situations arise and requests a remand to reconsider NSK's request and to determine whether it is proper to advise Customs to refund NSK's excess cash deposits. *Id.* at 25–26.

The Court remands this case to Commerce to reconsider NSK's request for a refund of excess cash deposits, prior to liquidation, for overcollection resulting from clerical errors in the Final Results and to consider whether the payment of interest is proper in this case.

### CONCLUSION

NSK's motion for judgment upon the agency record is granted to the extend that this case is remanded to Commerce to (1) further explain its treatment of NSK's sample sales; and (2) reconsider NSK's request for a refund of excess cash deposits for overcollection due to certain clerical errors in the Final Results and to determine whether the payment of interest is appropriate in this case. Commerce's Final Results are sustained in all other respects.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

