SHIKOKU CHEMICALS CORPORA-
TION, Mitsubishi Corporation, and Mit-
subishi International Corporation,
Plaintiffs,

v.

The UNITED STATES, Defendant.

Court No. 91–05–00389.

United States Court of
International Trade.

May 18, 1992.

Weil, Gotshal & Manges, A. Paul Victor,
Douglas A. Nave and David W. Oliver,
New York City, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen.,
David M. Cohen, Director, Commercial Liti-
gation Branch, Civ. Div., U.S. Dept. of Jus-
tice, Washington, D.C. (Vanessa P. Sciarra,
Jeffrey C. Lowe, Office of Chief Counsel
for Import Admin., U.S. Dept. of Com-
merce, of counsel), for defendant.

## OPINION

RESTANI, Judge:

The plaintiffs in this action, Shikoku
Chemicals Corporation ("Shikoku"), Mitsu-
bishi Corporation, and Mitsubishi Interna-
tional Corporation,[1] challenge the final re-
sults of the Department of Commerce
("Commerce") in the antidumping adminis-
trative reviews for cyanuric acid and its
chlorinated derivatives from Japan as set
forth in *Cyanuric Acid and its Chlorinat-
ed Derivatives from Japan*, 56 Fed.Reg.
19,338 (Dep't Comm. Apr. 26, 1991) ("Final
Det."). This determination covered cyanur-
ic acid and its chlorinated derivatives, di-
chloro isocyanurates ("DCA") and trichloro
isocyanuric acid ("TCA").[2] Plaintiffs are
not appealing Commerce's determination
regarding cyanuric acid; for reasons which
will explained *infra*, the only merchandise
involved in the present appeal is DCA.

### Background

On February 29, 1984, Commerce pub-
lished a notice of final determination in the
*Federal Register* that cyanuric acid, DCA
and TCA from Japan were being sold at

---

1. Plaintiffs, Shikoku, Mitsubishi Corporation
and Mitsubishi International Corporation, are a
Japanese producer, Japanese exporter, and Unit-
ed States importer respectively, of cyanuric acid
and its chlorinated derivatives.

2. Cyanuric acid is a raw material which is used
as the basis for producing several chlorinated
derivatives. Two of these derivatives, DCA and

TCA, are used as swimming pool disinfectants.
They are sold in three basic consistencies: pow-
der, granular and tablet. The tablet form of
DCA and TCA is obtained only after unpackag-
ing and reprocessing of the DCA and TCA gran-
ules. Only the granular form is exported by
Shikoku to the United States.

less than fair value in the United States. *Cyanuric Acid and its Chlorinated Derivatives from Japan Used in the Swimming Pool Trade*, 49 Fed.Reg. 7,424 (Dep't Comm.1984). An antidumping duty order covering the subject merchandise was published on April 27, 1984. *Cyanuric Acid and its Chlorinated Derivatives from Japan Used in the Swimming Pool Trade*, 49 Fed.Reg. 18,148 (Dep't Comm.1984).

Over a period of almost five years, Commerce conducted four administrative reviews of cyanuric acid, DCA and TCA.[3] In the determination at issue in this appeal, Commerce published the results of its fifth and sixth administrative reviews. Final Det. at 19,338.

Although Commerce established a margin of .66 percent for plaintiffs' sales of TCA in the first administrative review, no dumping margins above a de minimis level were found in the second, third and fourth administrative reviews. After finding a de minimis dumping margin in the fifth and sixth administrative reviews, Commerce revoked the antidumping duty order covering TCA. Final Det. at 19,342. Plaintiffs do not challenge Commerce's determination regarding TCA.

For plaintiffs' sales of DCA, Commerce established a dumping margin of 9.66 percent in the first administrative review. The dumping margin was found to be de minimis in the second administrative review. In the third and fourth administrative reviews, Commerce assigned DCA a margin of zero. In the fifth and sixth administrative reviews, however, Commerce established a dumping margin of .81 and .91 percent, respectively, for plaintiffs' DCA sales. Accordingly, Commerce refused plaintiffs' request to revoke the antidumping duty order covering DCA.[4]

Plaintiffs appeal Commerce's decision, and request the court to issue a judgment on the administrative record. Briefs were submitted by the parties, and oral argument was held on February 27, 1992. At oral argument, the court requested the parties file supplemental briefs regarding Commerce's calculation of plaintiffs' adjustment for home market packing expenses.

## Issues

In the original LTFV investigation and the first four administrative reviews, Commerce permitted Shikoku to adjust home market prices to reflect charges paid by Shikoku to its subcontractor for repacking DCA from exportable granular merchandise to a form suitable for home market sale. Commerce calculated the amount of the home market price adjustment by dividing Shikoku's total expenses for repackaging by the total volume of repackaged granular and tablet merchandise. In the final determination, however, Commerce altered its method of allocation by excluding from the repacking costs identifiable costs of making tablets. Under this approach, the home market repacking expenses were diminished, and a more than de minimis margin resulted.

Plaintiffs argue that they have been unfairly penalized because Commerce has applied a new methodology retroactively in spite of Shikoku's reliance over the years on the old formula. In addition, plaintiffs argue the new method is rife with inconsistencies and errors.

In response, Commerce argues that the method of calculation employed in the final determination is reasonable because the foreign market value adjustment should re-

---

**3.** *See Cyanuric Acid and its Chlorinated Derivatives from Japan*, 51 Fed.Reg. 45,495 (Dep't Comm.1986) (first administrative review covering the period November 18, 1983 through March 13, 1984); *Cyanuric Acid and its Chlorinated Derivatives from Japan*, 52 Fed.Reg. 15,970 (Dep't Comm.1987) (second administrative review covering the period April 1, 1984 through March 31, 1985); *Cyanuric Acid and its Chlorinated Derivatives from Japan*, 55 Fed.Reg. 1,690 (Dep't Comm.1990) (third and fourth administrative reviews covering the consecutive review periods of April 1, 1985 through March 31, 1986 and April 1, 1986 through March 31, 1987, respectively).

**4.** The regulations provide that Commerce may revoke an antidumping duty order if the subject merchandise has not been sold at less than foreign market value for three years subsequent to the publication of the order. *See* 19 C.F.R. § 353.25(b)(1) (1991).

flect only the percentage of repackaging expenses that is directly attributable to granular merchandise since this is the only form sold in the United States. The crux of Commerce's argument is that the revised calculation is in fact more accurate and reliable than the undifferentiated expense data used in the first four administrative reviews. Commerce submits that this is not a change in methodology, but rather a utilization of more accurate data. Alternatively, Commerce contends that even if the court finds this to be a change in methodology, the final determination should still be sustained because Commerce adequately explained its decision, and the decision is supported by substantial evidence on the record.

### Analysis

*1. The new calculation is likely a slight improvement on the old calculation.*

Plaintiffs raise several arguments concerning the accuracy of the new calculation. Commerce's new approach was an attempt to eliminate expenses that were directly attributable to *making tablets* and *tablet repackaging*, because chlorinated derivative ("CD") products in tablet form were not exported to the United States during the period of investigation. The change was made as a result of information requested and obtained during the last verification. Assuming no other distorting factors were present, elimination of these irrelevant expenses would produce a more accurate calculation of the labor expenses incurred in packing *granular* CD merchandise. Plaintiffs contend, however, that the new approach continues to use allocations, not actual expenses and the result is not an improvement.

In their initial briefs, plaintiffs argued that Commerce reduced Shikoku's repacking costs by subtracting certain costs of making tablets, and then allocating the remaining packing expenses over *both* granular and tablet merchandise resulting in an unreasonably small expense adjustment. The government responded by contending that the denominator of the equation con-

tains a typographical error; in fact, Shikoku's tablet production was not included in the results. The court finds that Commerce is correct on this point and the denominator does not reflect tablet production. Although a number representing tablet merchandise appears in the denominator, the equation works out to the stated answer only if tablet merchandise is omitted from the denominator. *See* Verification Report ("Verif. Rep.") at 17.

At oral argument, plaintiffs raised two additional points regarding packing costs in Commerce's calculation from Shikoku's fixed rate for labor expenses, which they claimed indicated that the new calculation was not more accurate. The first point concerned the inclusion of cyanuric acid. Plaintiffs argue that since Shikoku sold only granular chlorinated derivatives (DCA and TCA) in the United States market during the relevant time period, under Commerce's new approach packing data related to cyanuric acid should have been excluded.

Shikoku's wholly-owned subcontractor, Shikoku Kosan performed all drum packing and repacking functions for both cyanuric acid and CD products. Specifically, Shikoku Kosan packed the merchandise into drums, changed the granular product into tablet form, repackaged granular products sold in the home market, and delivered the products from the packaging area to the loading area.[5] Verif.Rep. at 14. Shikoku paid Shikoku Kosan a gross fixed monthly payment for the aforementioned services in addition to a piece rate for repackaging CD products. *Id.* The fixed monthly rate encompasses costs of repackaging of cyanuric acid as well as CD products.

There appears to be no dispute regarding the first two services performed by Shikoku Kosan: drum packaging and making tablets. Commerce was able to exclude expenses related to cyanuric acid production from its calculation of such costs because Shikoku distinguished between the two kinds of merchandise in its calculations. Thus, such expenses related to

**5.** Commerce excluded delivery expenses from its calculation because Shikoku did not include this category of expenses in its calculation. Accordingly, delivery expenses are not at issue.

cyanuric acid production are separable from the expenses pertaining to CD products. Case repacking expenses, however, were not segregated by Commerce.

Case repacking involved the repackaging of cyanuric acid and CD products sold in the home market from drums to bags or boxes. Shikoku used a single figure for case repacking expenses in the calculation of the fixed labor rate. Commerce alleges that it did not differentiate between CD products and cyanuric acid with respect to repacking expenses because it lacked sufficient data for allocation of these expenses between cyanuric acid and CD products. It is unclear whether Commerce could have refined its calculation by obtaining more information at verification. It certainly did not request this type of information prior to verification or in any earlier administrative review.

At oral argument, plaintiffs also argued that Commerce incorrectly included small quantities of powders in the calculation of Shikoku's total granular CD production. Plaintiffs contend that the resulting figure is inaccurate because only granular CD merchandise was sold in the United States during the applicable time period, and under Commerce's new approach powders should not have been included in the calculation.

Shikoku does not argue that inclusion of data relating to the "small quantities of powders" [6] is, in fact, significant. As with the granular product, it argues that the new approach is still an allocation and thus the verifier did not accomplish his goal of determining actual expenses attributable to the granular product. Shikoku is correct on this point, but it has not demonstrated that the new allocation is less accurate than the old approach.

The government, for its part, has not clearly demonstrated that the new allocation is an improvement,[7] but it appears that expenses of making tablets were significant so it is likely that there was a marginal increase in accuracy.

*2. Shikoku's reliance interest is sufficient to preclude Commerce from adopting the new method of calculating packing expenses.*

Plaintiffs argue that they relied on the old method of calculating the home market price packing adjustment. They claim they were damaged when Commerce adopted a new approach during the fifth and sixth reviews when they were almost eligible for consideration for revocation of the antidumping duty order. There is no serious challenge to plaintiffs' contention that they actually relied on the old pricing method. The record contains evidence that plaintiffs adjusted their prices in accordance with methodology consistently applied by Commerce in an attempt to comply with United States antidumping law. *See* Affidavit of Mr. Nobuo Gotoh, Manager, Business Administration Section, Chemicals Division, Shikoku Chemicals Corp. (Feb. 4, 1991), Public Doc. 107. The Government's response is not that plaintiffs did not rely, but rather that they had no right to rely on the continuation of a particular calculation methodology.

The government also argues that Commerce did not view the use of actual expenses as a methodology new to its home market value calculation. Reasoning that the new formula is the result of the standard Commerce practice of preferring actual expenses over allocated expenses, the government contends that it is not a truly "new" methodology. This argument is unpersuasive. Clearly, Commerce has employed a new process and approach (both synonyms for "methodology") in its calculation because the new equation attempts, albeit partially unsuccessfully, to reflect only the product packing expenses actually related to the granular form of the merchandise; expenses solely related to tablets are excluded. The question the court must address is whether Commerce abused its discretion in adopting a slightly improved

---

**6.** *See* Verif.Rep. at 14.

**7.** Neither party provided the court with calculations which would more readily demonstrate accuracy.

allocation methodology in the face of years of acceptance of the prior approach.

In the final determination, Commerce rejected Shikoku's argument based on administrative equity and justified its change of methodology, stating: "The Department's standard practice is to employ actual expenses wherever possible, and while the Department does sometimes employ a less-accurate method of allocation in the interests of administrative equity, it will not perpetuate an error on those grounds." Final Det. at 19,341 (comment 7). Under the facts of this case, Commerce's explanation is not an adequate reason for switching methodologies. Commerce does not argue that key facts changed. Such changes could warrant a new approach. Nor was there a breakthrough in methodology which would reveal significant and heretofore undiscovered dumping. This was simply a decision on the part of a verifier to ask for detailed cost information not previously sought, presumably because the verifier thought he could come closer to a calculation of actual expenses of granular production.

Although it did not achieve its goal of utilizing actual expenses, Commerce probably came closer to that goal than it was able to under the prior methodology. The challenge before the court, however, is not a challenge to the results of the first, second, third, or fourth reviews. While plaintiffs are not totally without fault, as they apparently could have come forth with their own data to achieve a better allocation at an earlier date, in fact, the information was a small part of a complicated information gathering and assessment process. To expect respondents to review data constantly to determine if they could suggest an improved but less advantageous method of calculation of minute cost adjustments is not realistic. At some point, Commerce must be bound by its prior actions so that parties have a chance to purge themselves of antidumping liabilities.

■ Principles of fairness prevent Commerce from changing its methodology at this late stage.[8] Commerce is required to administer the antidumping laws fairly. *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 933 (Fed.Cir.1984); *Budd Co. v. United States*, 14 CIT ——, ——, 746 F.Supp. 1093, 1099 (1990). Adherence to prior methodologies is required in some circumstances. *See e.g., Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1555 (Fed.Cir.1988) (finding no jurisdiction, but stating "[t]he law is the law at the time of its existence, whether wrong or not, and 'practical men' have a right to rely on it at the time they perpetrate their actions"); *IPSCO, Inc. v. United States*, 12 CIT 359, 378 n. 27, 687 F.Supp. 614, 631 n. 27, *reh'g denied*, 12 CIT 953, 697 F.Supp. 1222 (1988) (held, in countervailing duty case, retroactive application of new methodologies may be barred if pre-grant prejudicial reliance is demonstrated); *Brother Indus. v. United States*, 15 CIT ——, ——, 771 F.Supp. 374, 382 (1991) (the reason for prospective application of a new methodology is to avoid giving a new quality or effect to acts or conduct already performed) (quoting *Union Pacific R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). Commerce itself, in *Calcium Hypochlorite from Japan*, 55 Fed.Reg. 41,-259, 41260 (Dep't Comm.1990) declined to apply a new and "better" methodology

---

**8.** In *United States v. Midwest Oil Co.*, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915), the Supreme Court, in discussing the establishment of a uniform custom based on executive branch rulings, observed that:

[G]overnment is a practical affair intended for practical men. Both officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive Department on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself even when the validity of the practice is the subject of investigation.

*Id.* at 472–73, 35 S.Ct. at 312–13. Long-continued methodologies naturally serve to provide the basis from which subjects of agency investigations adjust their behavior.

based on "administrative equity." Commerce did state that it would not change methodologies because the new methodology was "subject to misinterpretation." *Id.* It is not clear that such misinterpretation was anything more substantial than the problems faced here.

While the approach here was not contained in a published rule or promulgated regulation, it, in effect, became the law of these proceedings. If the original error was more significant, perhaps fairness to petitioners in antidumping investigations would warrant correction at even this late date. The margin resulting from the new approach, however, is barely above de minimis. It is simply too late to mandate another three years of administrative reviews because of a last minute "improvement" in Commerce's methodology. Plaintiffs' reliance, the unchanged fact pattern, and the lack of discovery of significant error lead the court to conclude that Commerce did not have adequate reasons for its last minute change in methodology.

### Conclusion

Commerce abused its discretion and acted unreasonably in changing its allocation methodology for repacking costs in the latest reviews, thereby preventing plaintiffs from qualifying for consideration for revocation. Under these facts, plaintiffs had a right to rely on Commerce's consistent approach extending over the original fair value investigation and four annual reviews. This action is remanded for margin calculations consistent with this opinion. Commerce should then proceed to make whatever revocation decision is appropriate.