**Slip Op. 00-142**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                        :
RHP BEARINGS LTD., NSK BEARINGS         :
EUROPE LTD. and NSK CORPORATION,        :
                                        :
        Plaintiffs,                     :
                                        :
        v.                              :  Court No. 98-07-02526
                                        :
UNITED STATES,                          :
                                        :
        Defendant,                      :
                                        :
THE TORRINGTON COMPANY,                 :
                                        :
        Defendant-Intervenor.           :
_____  :


        Plaintiffs, RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively "RHP-NSK"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u>, 63 Fed. Reg. 33,320 (June 18, 1998).

        Specifically, RHP-NSK claims that Commerce erred in: (1) failing to apply the special rule for merchandise with value added after importation under 19 U.S.C. § 1677a (1994); (2) calculating profit for constructed value; (3) denying a partial, price-based level of trade adjustment to normal value; and (4) deducting United States repacking expenses as direct selling expenses.

        **Held:** RHP-NSK's USCIT 56.2 motion is denied. Commerce's determination is affirmed.

[RHP-NSK's motion is denied. Case dismissed.]

                                        Dated: November 2, 2000

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for RHP-NSK.

David W. Ogden, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Thomas H. Fine, Patrick V. Gallagher, Myles S. Getlan, William Isasi and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Geert De Prest, Lane S. Hurewitz and Wesley K. Caine) for The Torrington Company.

**OPINION**

**TSOUCALAS, Senior Judge:** Plaintiffs, RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively "RHP-NSK"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 63 Fed. Reg. 33,320 (June 18, 1998).

Specifically, RHP-NSK claims that Commerce erred in: (1) failing to apply the special rule for merchandise with value added after importation under 19 U.S.C. § 1677a (1994); (2) calculating

profit for constructed value ("CV"); (3) denying a partial, price-based level of trade ("LOT") adjustment to normal value ("NV"); and (4) deducting United States repacking expenses as direct selling expenses.

## BACKGROUND

This case concerns the eighth review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof imported to the United States during the review period of May 1, 1996 through April 30, 1997.[1] Commerce published the preliminary results of the subject review on February 9, 1998. See Antifriction Bearings (Other Than Tapered Roller Bearings) And Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and The United Kingdom ("Preliminary Results"), 63 Fed. Reg. 6512. Commerce published the Final Results on June 18, 1998. See 63 Fed. Reg. at 33,320. Oral argument was heard on October 8, 1999.

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995) ("URAA"). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT ___, ___, 104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of review for antidumping proceedings).

## DISCUSSION

### I.   Commerce's Refusal to Apply the Special Rule for Further Manufacturing to RHP-NSK's Constructed Export Price Sales

#### A.   Background

An antidumping duty is imposed upon imported merchandise when (1) Commerce determines such merchandise is being dumped, that is, sold or likely to be sold in the United States at less than fair value, and (2) the International Trade Commission determines that an industry in the United States is materially injured or is threatened with material injury.  See 19 U.S.C. § 1673 (1994); 19

U.S.C. § 1677(34) (1994).  To determine in an investigation or an administrative review whether there is dumping, Commerce compares the price of the imported merchandise in the United States to the NV for the same or similar merchandise in the home market.  See 19 U.S.C. § 1677b (1994).  The price in the United States is calculated using either an export price ("EP") or constructed export price ("CEP").  See 19 U.S.C. § 1677a(a), (b).

The Statement of Administrative Action[2] ("SAA") accompanying the Uruguay Round Agreements Act ("URAA") clarifies that Commerce will classify the price of a United States sales transaction as an EP if "the first sale to an unaffiliated purchaser in the United States, or to an unaffiliated purchaser for export to the United States, is made by the producer or exporter in the home market prior to the date of importation."  H.R. Doc. No. 103-316, at 822 (1994).  On the other hand, "[i]f, before or after the time of

---

[2]  The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. No. 103-316, at 656 (1994).  "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter," then Commerce will classify the price of a United States sales transaction as a CEP.  Id.; see 19 U.S.C. § 1677a(b); Koenig & Bauer-Albert AG v. United States, 22 CIT ___, ___, 15 F. Supp. 2d 834, 850-52 (1998) (discussing when to apply EP or CEP methodology).

Commerce then makes adjustments to the starting price used to establish EP or CEP by adding: (1) packing costs for shipment to the United States, if not already included in the price; (2) import duties which have been rebated or not collected due to exportation of the subject merchandise to the United States; and (3) certain countervailing duties if applicable.  See 19 U.S.C. § 1677a(c)(1)(A)-(C); SAA at 823.  Also, for both EP and CEP, Commerce will reduce the starting price by the amount, if any, included in such price that is attributable to: "(1) transportation and other expenses, including warehousing expenses, incurred in bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States; and (2) . . . export taxes or other charges imposed by the exporting country."  See SAA at 823; see 19 U.S.C. §

1677a(c)(2)(A), (B).


Commerce must reduce the price used to establish CEP by any of the following amounts associated with economic activities occurring in the United States: (1) commissions paid in "selling the subject merchandise in the United States"; (2) direct selling expenses, that is, "expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties"; (3) "any selling expenses that the seller pays on behalf of the purchaser" (assumptions); (4) indirect selling expenses, that is, any selling expenses not deducted under any of the first three categories of deductions; (5) certain expenses resulting from further manufacture or assembly (including additional material and labor) performed on the merchandise after its importation into the United States; and (6) profit allocated to the expenses described in categories (1) through (5).  19 U.S.C. § 1677a(d)(1)-(3); see SAA at 823-24.


Commerce calculates the expenses resulting from further manufacture or assembly using one of two statutory methods.  See 19 U.S.C. § 1677a(d), (e).  The first method provides that Commerce shall reduce "the price used to establish constructed export price by . . . the cost of any further manufacture or assembly (including

additional material and labor), except in [certain] circumstances."

19 U.S.C. § 1677a(d)(2).  When the first method does not apply,

Commerce applies a "special rule for merchandise with value added

after importation" ("special rule").  19 U.S.C. § 1677a(e).  The

special rule provides the following:

> Where the subject merchandise is imported by a
> person affiliated with the exporter or producer, and the
> value added in the United States by the affiliated person
> is likely to exceed substantially the value of the
> subject merchandise, the administering authority shall
> determine the constructed export price for such
> merchandise by using one of the following prices if there
> is a sufficient quantity of sales to provide a reasonable
> basis for comparison and the administering authority
> determines that the use of such sales is appropriate:
>     (1) The price of identical subject merchandise sold
> by the exporter or producer to an unaffiliated person.
>     (2) The price of other subject merchandise sold by
> the exporter or producer to an unaffiliated person.
>
> If there is not a sufficient quantity of sales to provide
> a reasonable basis for comparison under paragraph (1) or
> (2), or the administering authority determines that
> neither of the prices described in such paragraphs is
> appropriate, then the constructed export price may be
> determined on any other reasonable basis.

19 U.S.C. § 1677a(e).

In prior reviews, Commerce applied the special rule to RHP-

NSK's data after estimating that value added in the United States

substantially exceeded the value of the subject merchandise and

"used sales of other subject merchandise as the basis for margins

for these sales." Antifriction Bearings from United Kingdom:

NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Sixth Administrative Review 5/1/94-4/30/95 (July 2, 1996) (Case No. A-412-801) at 3; see Antifriction Bearings from United Kingdom: NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Seventh Administrative Review 5/1/95-4/30/96 (Mar. 28, 1997) (Case No. A-412-801) at 3-4.

In this review, Commerce transmitted a letter to interested parties and appended a questionnaire divided into five sections. The letter explained that the recipient was required to complete section E, Cost of Further Manufacture or Assembly Performed in the United States, if the subject merchandise was further processed in the United States. Accordingly, RHP-NSK submitted complete further manufacturing data in response to Section E of Commerce's questionnaire. See Antifriction Bearings from United Kingdom: NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Eighth Administrative Review 5/1/96-4/30/97 (Jan. 29, 1998) (Case No. A-412-801) at 4. The letter also stated that if the party "believe[s] the value added in the United States exceeds substantially the value of the merchandise imported into the United States, [the party should] contact the official in charge immediately." Letter from Commerce Transmitting Questionnaire (June 20, 1997), Def.'s Public App. Ex. 1 at 2. Commerce asserts

that "the record contains no evidence that [RHP-NSK] requested Commerce to excuse it from responding to Section E of the questionnaire upon the grounds that the value added in the United States to [RHP-NSK] imports substantially exceeded the value of the imports." Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Mem.") at 16-17. RHP-NSK does not dispute this assertion. See RHP-NSK's Mem. P. & A. Supp. Mot. J. Agency R. ("RHP-NSK's Mem."); RHP-NSK's Reply Mem. Supp. Mot. J. Agency R. ("RHP-NSK's Reply").

Additionally, question 8 of Section A of the questionnaire asked the respondent to report the weighted-average net price to the affiliated importer for each further-manufactured product and the weighted-average net price for each further manufactured final product in a manner which would permit Commerce to compare the transfer prices of the imported products to the final product sold in the United States. See Def.'s Public App. Ex. 1 at A-8. Question 8 explained that its purpose was "to provide [Commerce] with the information necessary to determine whether the value-added in the United States exceeds substantially the value of the subject merchandise that has been further processed." Id. at A-9 n.6. Question 8 also provided that if the party did "not believe that the value-added in the United States exceeds substantially the value of the subject merchandise that has been further processed,

[the party] need not provide this information." Id.  RHP-NSK did not respond to question 8 of Section A of the questionnaire.  See Def.'s Public App. Ex. 2 at 32-33.

Commerce evaluated RHP-NSK's data and analyzed sales of bearings and parts that were further manufactured in the United States in the "same manner as non-further manufactured products but adjusted for the cost of further manufacturing."  Antifriction Bearings from United Kingdom: NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Eighth Administrative Review 5/1/96-4/30/97 (Jan. 29, 1998) (Case No. A-412-801) at 4.  In the Preliminary Results, Commerce determined "that the estimated value added in the United States by all firms, with the exception of NSK/RHP and NPBS, accounted for at least 65 percent of the price charged to the first unaffiliated customer for the merchandise as sold in the United States."  63 Fed. Reg. at 6515.  Thus, for RHP-NSK's further-manufactured imports, Commerce reduced the sales price to the first unaffiliated customer by the cost of further manufacturing to calculate CEP.  See Antifriction Bearings from United Kingdom: NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Eighth Administrative Review 5/1/96-4/30/97 (Jan. 29, 1998) (Case No. A-412-801) at 4.

Following the Preliminary Results, RHP-NSK used data on the record to perform its own calculation of the value added in the United States and informed Commerce that it qualified for the special rule. See App. Supp. RHP-NSK's Mem., Ex. 6, U.K. Issues Br. (Mar. 16, 1998). RHP-NSK asked Commerce to apply the special rule as it had done in prior reviews. See id.

In the Final Results, Commerce declined to apply the special rule for further manufacturing set forth in 19 U.S.C. § 1677a(e). 63 Fed. Reg. 33,338. Commerce explained its rationale as follows:

> As we stated in our new regulations, the special rule for further manufacturing exists in order to reduce [Commerce's] administrative burden. 62 [Fed. Reg.] at 27,353. See, also, section 772(e) of the Act, which provides that [Commerce] need only apply the special rule where it determines that the use of such alternative calculation methodologies is appropriate. We retain the authority to refrain from applying the special rule in those situations where the value added, while large, is simple to calculate. Id. Respondents submitted Section E data in its questionnaire and supplemental responses. We acted within our discretion by employing this data to calculate the U.S. value added, as the calculation involves little more than the subtraction of the value-added figures which [RHP-NSK] provided. Thus, this case does not present the complex data-gathering and calculation burdens contemplated by the special rule.

Final Results, 63 Fed. Reg. at 33,338.


**B.    Contentions of the Parties**

RHP-NSK contends that Commerce erred in refusing to apply the

special rule to its further-manufactured imports. RHP-NSK's Mem. at 3. RHP-NSK maintains that the special rule provides that if certain requirements were met, Commerce was required "to determine CEP for subject merchandise further manufactured in the United States by using either the price of identical subject merchandise, or the price of other subject merchandise, sold by the exporter or producer to an unaffiliated person," as provided by 19 U.S.C. § 1677a(e). Id. Thus, RHP-NSK believes that once Commerce determines that the value added in the United States is at least 65% of the price charged to the first unaffiliated purchasers, Commerce has no choice but to apply the special rule as provided in § 1677a(e). See id. at 13.

RHP-NSK argues that in the Preliminary Results, Commerce erroneously determined that RHP-NSK failed to qualify for the special rule and refused to correct its error after RHP-NSK showed it to Commerce. See id. at 5. RHP-NSK contends that instead of correcting the error, Commerce "made up a new reason for why it had decided not to apply the [s]pecial [r]ule to [RHP-NSK]," namely, that RHP-NSK's "value-added figures had been simple to calculate." Id. at 5-6. RHP-NSK argues that the "facts do not support Commerce's post-hoc assertion that it rejected use of the [s]pecial [r]ule with respect to [RHP-NSK] pursuant to so-called

discretionary authority." Id. at 15.


RHP-NSK further contends that although it is unnecessary to examine legislative history because the statute is clear, the legislative history confirms that Commerce must apply the special rule whenever the facts meet the terms of § 1677a(e). See id. at 16. Specifically, RHP-NSK maintains that the SAA "says nothing about Commerce having discretionary authority to jettison [§ 1677a(e)] and revert to [§ 1677a(d)(2)] (even when the burdens imposed by that provision are less than enormous)." Id.


Finally, RHP-NSK maintains that the Court should reject Commerce's determination because it offends "principles of procedural fairness found in the statute." Id. at 17. RHP-NSK points to Shikoku Chems. Corp. v. United States, 16 CIT 382, 795 F. Supp. 417 (1992) for the proposition that Commerce abuses its discretion and acts unreasonably when it consistently applies a certain methodology in a series of reviews then alters the methodology without warning, to the detriment of the plaintiff. See id. According to RHP-NSK, the facts of the instant case are analogous to those in Shikoku, where the court recognized that the new method might have been an improvement but held that Commerce had abused its discretion and acted unreasonably. See id.

Commerce contends that since "Congress has not specified the criteria that Commerce must utilize in determining whether the use of the alternative methodologies is appropriate[,] Congress has granted to Commerce broad discretion in determining when the use of the alternative methodologies is appropriate." Def.'s Mem. at 13. Commerce maintains that its refusal to use the special rule was appropriate because it possessed the authority to "refrain from applying the special rule in situations in which the value added, though large, is simple to calculate." Id. Commerce believes that "the special rule requires not only that the value added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise, but also that Commerce 'determines that the use of' the specified sales prices (or alternative methodologies for calculating CEP) is appropriate." Id. at 20. In this circumstance, Commerce maintains that the use of the special rule was not appropriate since the value added was simple to calculate under § 1677a(d)(2). See id. at 21.

Commerce also contends "[t]he fact that, in the Preliminary Results, Commerce may have calculated [RHP-NSK's] CEP using the traditional value-added calculation methodology because of the erroneous conclusion that [RHP-NSK] did not meet the 65 percent standard does not preclude Commerce from using the same CEP for the

final results for different reasons." Id. at 22. Commerce distinguishes Shikoku on the grounds that: (1) Commerce had made determinations on this issue in only two prior reviews and, therefore, had not formulated a policy yet; (2) there is no evidence that RHP-NSK relied on Commerce's use of the special rule; (3) this case does not involve the possible revocation of a dumping order and, therefore, does not present the same issue of unfairness as did Shikoku. See id. at 25. Finally, Commerce argues that it did not unfairly single out RHP-NSK because the other respondents, unlike RHP-NSK, had "demonstrated with their initial Section A questionnaire response that the value added in the United States substantially exceeded the value of the imported merchandise." Id. at 25-26.

The Torrington Company ("Torrington") argues that Congress enacted § 1677a(d)(2) and (e) in order to ensure that all merchandise subject to further manufacturing is captured in the CEP calculation. See Torrington's Resp. RHP-NSK's Mot. J. Agency R. ("Torrington's Resp.") at 3. Torrington maintains that RHP-NSK misinterprets the word "shall" in § 1677a(e) as a requirement that Commerce apply the special rule, and that the correct interpretation is that Congress used the word "shall" as an indication that Commerce should calculate CEP for all merchandise

subject to further manufacturing.  See id.  Torrington argues that Commerce has broad discretion as to when to apply the special rule, and having found that its use was inappropriate here, correctly applied the traditional rule.  See id. at 12.  Torrington contends that the statute's legislative history supports Commerce's determination.  See id. at 15-16.


##### C.   Analysis

First, the Court addresses RHP-NSK's contention that Commerce's use of the special rule in two prior reviews under similar circumstances constitutes a "past practice" from which Commerce cannot deviate without providing adequate justification. See RHP-NSK's Mem. at 17-18 (citing Shikoku in support).  "It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . .'" Hussey Cooper, Ltd. v. United States, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993) (quoting Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988)).  Commerce must explain the reason for its departure to allow the court to "'understand the basis of the agency's action and . . . judge the consistency of that action with the agency's mandate.'"  Id. at 998, 834 F. Supp. at 419 (quoting Atchinson, Topeka & Santa Fe Ry.

Co. v. Wichita Bd. Of Trade, 412 U.S. 800, 808 (1973)).


Commerce is not required to follow its prior practice if new facts or arguments support a different conclusion. See id. at 997, 834 F. Supp. at 418. But "[w]hen the Court finds that an agency has departed from past practice without an adequate explanation for the basis of the departure, the agency's determination must be rejected." American Silicon Techs. v. United States, 22 CIT ___, ___, 19 F. Supp. 2d 1121, 1123 (1998).


Although the application of the special rule in only two prior reviews does not form a long-established practice under the circumstances presented here, Commerce is under an obligation to explain the apparent inconsistency of its approach in this review and the two preceding reviews. The Court finds that Commerce provided adequate justification for its refusal to apply the special rule in this review. Commerce justified its refusal to apply the rule on the ground of administrative convenience and, more specifically, on its belief that "the special rule for further manufacturing exists in order to reduce [Commerce's] administrative burden." Final Results, 63 Fed. Reg. at 33,338. Thus, Commerce retained "the authority to refrain from applying the special rule in those situations where the value added, while large, is simple

to calculate." Id. Administrative convenience is certainly a valid ground upon which Commerce may base its refusal to apply the special rule in this review. See SAA at 826 (purpose of special rule is to save "Commerce the considerable effort of measuring precisely the U.S. value added."); Inland Steel Indus. v. United States, 21 CIT 553, 567-68, 967 F. Supp. 1338, 1354 (1997) (upholding methodology that Commerce developed for administrative convenience).

Additionally, RHP-NSK's reliance on Shikoku, which it cites for the proposition that Commerce must adhere to its prior decisions, is misplaced. Shikoku dealt with an attempt by Commerce to adopt a slightly improved allocation methodology of calculating the home market price packing adjustment after years of acceptance of another methodology. See Shikoku, 16 CIT at 387, 795 F. Supp. at 420-21. At issue were the fifth and sixth administrative reviews of certain merchandise imported from Japan. See id. at 383, 795 F. Supp. at 417-18. The plaintiffs' dumping margins for the previous three consecutive reviews of sales of the contested merchandise were found to be either de minimis or had a margin of zero. See id. at 383, 795 F. Supp. at 418. In the fifth and sixth administrative reviews, Commerce altered its allocation methodology for calculating home market packing expenses, resulting in barely

above <u>de minimis</u> margins and, thereby, Commerce refused plaintiffs'
request to revoke the outstanding antidumping duty order covering
the merchandise. <u>See id.</u> at 383-84, 795 F. Supp. at 418.
Commerce's new calculation was based on information requested for
the first time at verification. <u>See id.</u> at 387, 795 F. Supp. at
421.


     The court in <u>Shikoku</u> found that: (1) "Commerce [had] employed
a new process and approach (both synonyms for 'methodology')" in
calculating the home market packing expenses and did not merely
apply its standard practice of preferring actual expenses over
allocated expenses; (2) Commerce could not demonstrate that the new
allocation methodology was an improvement; and (3) the evidence on
record established that plaintiffs had relied on Commerce's old
methodology for calculating the home market price packing
adjustment by adjusting their prices in accordance with the
methodology that Commerce had consistently applied in prior
reviews. <u>Id.</u> at 386-87, 795 F. Supp. at 420. Under these
circumstances, the court, noting that "[t]he margin resulting from
the new approach . . . is barely above <u>de minimis</u>," determined that
it was "simply too late to mandate another three years of
administrative reviews because of a last minute 'improvement' in
Commerce's methodology" and concluded that "Commerce did not have

adequate reasons for its last minute change in methodology." Id. at 388, 795 F. Supp. at 422.


By contrast, Commerce has no long-established practice of disregarding administrative considerations and rigidly adhering to the special rule whenever value added in the United States exceeds 65 percent. This case does not present the situation in which, relying upon an old methodology, RHP-NSK had actually adjusted its prices and, except for the change in methodology, it would be entitled to a revocation of the outstanding antidumping duty order; therefore, the principles of fairness that prevented Commerce from changing its methodology in Shikoku are not present here.


The question that remains is whether Commerce's determination was "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at

issue." <u>Chevron</u>, 467 U.S. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." <u>Id.</u> (citation omitted).

On its face, 19 U.S.C. § 1677a(e) clearly provides Commerce with a great deal of discretion in adjusting CEP for the cost of further manufacture and assembly. When the value added to subject merchandise in the United States is likely to substantially exceed the value of the merchandise, Commerce must use specified surrogate prices if two conditions are met. <u>See</u> 19 U.S.C. § 1677a(e)(1), (2). The first condition, that there be "a sufficient quantity of sales to provide a reasonable basis for comparison," is not at issue here. <u>Id.</u> The second condition requires Commerce to "determine[] that the use of such sales is appropriate." <u>Id.</u> Thus, the second condition provides that Commerce is not forced to use the surrogate prices if it determines that their use is not "appropriate." <u>See id.</u> In such a circumstance, Commerce is

permitted to determine CEP "on any other reasonable basis."  Id.


Commerce, therefore, may determine whether the use of the surrogate prices is appropriate, and it may also determine the method by which to calculate CEP, when it finds that the use of the surrogate prices is not appropriate.  This holds true even if Commerce finds that the value added in the United States "is likely to exceed substantially the value of the subject merchandise."  19 U.S.C. § 1677a(e).  Thus, even if Commerce was to find that RHP-NSK's added value substantially exceeds the value of the merchandise, Commerce would still have the discretion to refuse to apply the special rule.[3]


To calculate value added, Commerce simply subtracted value-added figures using RHP-NSK's Section E data.  See Final Results, 63 Fed. Reg. 33,338.  Commerce determined that it would not employ a more complicated calculation using the special rule since such a calculation would be inappropriate "in those situations where the value added, while large, is simple to calculate."  Id.  The Court finds that Commerce acted within the discretion afforded to it by

_____

[3]   In fact, neither Commerce nor Torrington dispute that the value added to RHP-NSK's merchandise substantially exceeded the value of the merchandise.  See Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. at 22; Torrington's Resp. RHP-NSK's Mot. J. Agency R. at 18-20.

§ 1677a(e) in refusing to apply the special rule to RHP-NSK in this review.  The Court will not require Commerce to use the special rule when it finds the use inappropriate, since the imposition of such a requirement would be contrary to § 1677a(e).  This is especially true in light of the fact that there is no evidence that Commerce's calculation resulted in distortion or inaccuracy. Commerce's determination, therefore, is affirmed.

## II.   Commerce's CV Profit Calculation

### A.    Background

During this review, Commerce used CV as the basis for NV "when there were no usable sales of the foreign like product in the comparison market."  Preliminary Results, 63 Fed. Reg. at 6516. Commerce calculated the profit component of CV using the statutorily preferred methodology contained in 19 U.S.C. § 1677b(e)(2)(A).  See Final Results, 63 Fed. Reg. at 33,333.  The statutorily preferred method requires calculating an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade, for consumption in the foreign country."  19 U.S.C. § 1677b(e)(2)(A).

In applying the preferred methodology for calculating CV profit, Commerce determined that: (1) "an aggregate calculation that encompasses all foreign like products under consideration for normal value represents a reasonable interpretation of [19 U.S.C. § 1677b(e)(2)(A)]"; and (2) "the use of [such] aggregate data results in a reasonable and practical measure of profit that [it] can apply consistently in each case." Final Results, 63 Fed. Reg. at 33,333. In addition, Commerce used all sales "in the ordinary course of trade as the basis for calculating CV profit[,]" that is, it disregarded below-cost sales that were considered to be outside the ordinary course of trade. Id. at 33,334.

### B.   Contentions of the Parties

RHP-NSK argues that Commerce's use of aggregate data encompassing all foreign like products under consideration for NV in calculating CV profit is contrary to 19 U.S.C. § 1677b(e)(2)(A) and to the explicit hierarchy established by 19 U.S.C. § 1677(16) for selecting "foreign like product" for the CV profit calculation. See RHP-NSK's Mem. at 19-22. RHP-NSK maintains that if Commerce intends to calculate CV profit on such an aggregate basis, it must do so under the alternative methodology of 19 U.S.C. § 1677b(e)(2)(B)(i). See RHP-NSK's Reply at 17.

Commerce responds that it properly calculated CV profit pursuant to 19 U.S.C. § 1677b(e)(2)(A) based on aggregate profit data of all foreign like products under consideration for NV.  See Def.'s Mem. at 28-42.  Torrington agrees with Commerce's CV profit calculation under 19 U.S.C. § 1677b(e)(2)(A) and, therefore, maintains it is not necessary to use an alternative methodology under 19 U.S.C. § 1677b(e)(2)(B).  See Torrington's Resp. at 21-25.


### C.    Analysis

In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court upheld Commerce's CV profit methodology of using aggregate data of all foreign like products under consideration for NV as being consistent with the antidumping statute.  See id. at ___, 83 F. Supp. 2d at 1336.  Since RHP-NSK's arguments and the methodology used for calculating CV profit in this case are practically identical to those presented in RHP Bearings, the Court adheres to its reasoning in RHP Bearings and, therefore, finds that Commerce's CV profit calculation methodology is in accordance with law.  Moreover, since (1) 19 U.S.C. § 1677b(e)(2)(A) requires Commerce to use the "actual amount" for profit in connection with the production and sale of a foreign like product in the ordinary course of trade, and (2) 19 U.S.C. §

1677(15) provides that below-cost sales disregarded under 19 U.S.C. § 1677b(b)(1) are considered to be outside the ordinary course of trade, the Court finds that Commerce properly excluded below-cost sales from the CV profit calculation.

### III. Commerce's Denial of a Partial, Price-based LOT Adjustment to NV for RHP-NSK's CEP Sales

#### A.   Background

During this review, Commerce applied a CEP offset under 19 U.S.C. § 1677b(a)(7)(B) to NV for all of RHP-NSK's CEP sales. See Antifriction Bearings from United Kingdom: NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Eighth Administrative Review 5/1/96-4/30/97 (Jan. 29, 1998) (Case No. A-412-801) at 2-3. In reaching this result, Commerce first determined for RHP-NSK that there was one CEP LOT and two home market LOTs, and that the CEP LOT was not the same as either home market LOT. See id. Commerce found that "[b]ecause the [home market] levels of trade were different from the CEP level of trade, [it] could not match to sales at the same level of trade in the [home market] nor could [it] determine a level-of-trade adjustment based on NSK/RHP's [home market] sales." Id. Commerce also determined that there was "no other information that provides an appropriate basis for determining a level-of-trade adjustment." Id. For RHP-NSK's CEP

sales, Commerce "determined NV at the same level of trade as the [United States] sale to the unaffiliated customer and made a CEP offset adjustment in accordance with" § 1677b(a)(7)(B).   <u>Id.</u> Contrary to RHP-NSK's contentions, Commerce concluded that no provision of the antidumping statute provides for a "partial" LOT adjustment "between two home-market [LOTs] where neither level is equivalent to the level of the [United States] sale."   <u>Final Results</u>, 63 Fed. Reg. at 33,331.

### B.    Contentions of the Parties

RHP-NSK agrees with the manner in which Commerce determined the LOT of its CEP for NV transactions.  <u>See</u> RHP-NSK's Mem. at 28. In particular, RHP-NSK agrees that Commerce properly used the CEP as adjusted for § 1677a(d) expenses prior to its LOT analysis. RHP-NSK also argues that Commerce should have granted it a "partial," price-based LOT adjustment.  <u>See id.</u> at 30.

RHP-NSK first notes that Commerce found two LOTs in the home market, one corresponding to original equipment manufacturers ("OEM") sales and the other to after market ("AM") sales.  <u>See id.</u> at 29.  RHP-NSK also agrees that when Commerce matched CEP sales to home market OEM sales, Commerce correctly applied a CEP offset because there was no basis for quantifying a price-based LOT

adjustment for CEP to OEM NV matches.  See id.  Further, RHP-NSK notes that "Commerce correctly concluded that there was no record information that would allow Commerce to quantify the downward price adjustment to adjust fully the AM NV [LOT] to the CEP [LOT]." Id.  Nevertheless, RHP-NSK disagrees with Commerce's decision to apply a CEP offset when Commerce matched CEP sales to home market AM sales.  In these situations, RHP-NSK argues that § 1677b(a)(7)(A) and the SAA direct Commerce to calculate a partial, price-based LOT adjustment to NV for CEP sales measured by the price differences between OEM and AM LOTs.  See id. at 30.

RHP-NSK notes that the statute directs Commerce to adjust NV for any difference between CEP and NV "'wholly or partly'" due to a difference in LOT between CEP and NV.  Id. (quoting § 1677b(a)(7)(A)).  RHP-NSK also notes that § 1677b(a)(7)(B) indicates a CEP offset should only be used in the total absence of price-based LOT adjustments.  See id.  Accordingly, RHP-NSK claims that since there was evidence for quantifying price differences between OEM and AM LOTs, Commerce's failure to calculate a price-based LOT adjustment that partly accounted for such LOT differences violated the plain language of § 1677b(a)(7)(A).  See RHP-NSK's Reply at 17.

Commerce argues that it properly denied a partial LOT adjustment and applied a CEP offset to NV for all of RHP-NSK's CEP transactions. See Def.'s Mem. at 42-49. Contrary to RHP-NSK's reading of § 1677b(a)(7)(A), Commerce asserts that the statute only provides for an LOT price-based adjustment to NV based upon price differences in the home market between the CEP LOT and NV LOT when the differences can be quantified. See id. at 44-45. Commerce claims that the statute does not authorize an LOT price-based adjustment based upon different LOTs in the home market when the price difference between the CEP LOT sales and the home market LOT sales cannot be quantified. See id.; see also Final Results, 63 Fed. Reg. at 33,331 (explaining that Commerce does not read into § 1677b(a)(7)(A)'s "wholly or partly" language the authority to make an LOT adjustment based on differences between two home market LOTs where neither level is equivalent to the level of the United States sale). Commerce, therefore, asserts that since it reasonably interpreted § 1677b(a)(7)(A), the Court should sustain its denial of an LOT adjustment and grant of a CEP offset for all of RHP-NSK's CEP transactions. See Def.'s Mem. at 48-49.

Torrington generally agrees with Commerce's positions, emphasizing that Commerce reasonably interpreted § 1677b(a)(7)(A) as not providing for a "partial" LOT adjustment as contended by

RHP-NSK.  See Torrington's Resp. at 27.  Torrington further argues that even if § 1677b(a)(7)(A) permits a partial LOT adjustment, RHP-NSK nevertheless failed to submit record evidence to show entitlement to such an adjustment.  See id. at 30.  Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence.  See id. at 31.

### C.   Analysis

The Court notes that this issue has already been decided in NTN Bearing,  24 CIT at ___, 104 F. Supp. 2d at 127-31.  As this Court decided in NTN Bearing, Commerce's decision to deny RHP-NSK a partial, price-based LOT adjustment measured by price difference between home market OEM and AM sales was in accordance with law. There is no indication in § 1677b(a)(7)(A) that the pattern of price differences between two LOTs in the home market, absent a CEP LOT in the home market, justifies an LOT adjustment.  Rather, Commerce's interpretation of § 1677b(a)(7)(A) as only providing an LOT adjustment based upon price differences in the home market between the CEP LOT and the NV LOT was reasonable, especially in light of the existence of the CEP offset to cover situations such as those at issue here.

**IV.  Commerce's Treatment of RHP-NSK's United States Repacking
     Expenses as Direct Selling Expenses**

A.   Background[4]

RHP-NSK delivered the subject merchandise to unaffiliated
customers in the United States from warehouses owned and operated
by NSK Corporation.  See RHP-NSK's Resp. to Sect. C Questionnaire,
Investigation No. A-412-801, Admin. Rev. 5/1/96-4/30/97, at 39
(Sept. 8, 1997).  RHP-NSK normally ships merchandise in its
original containers from its United States warehouse, but in some
instances, it repacked the merchandise to accommodate orders for
smaller distributors.  See id.

For the price of the subject merchandise in the United States,
Commerce used EP or CEP, as appropriate, and calculated such prices
"based on the packed [free on board], [cost, insurance, and
freight], or delivered price to unaffiliated purchasers in, or for
exportation to, the United States."  Preliminary Results, 63 Fed.
Reg. at 6515.  Commerce also made deductions for: (1) discounts and
rebates; and (2) any movement expenses in accordance with 19 U.S.C.
§ 1677a(c)(2)(A).  See id.  In calculating CEP, Commerce made
additional adjustments in accordance with § 1677a(d)(1)-(3) by: (1)

_____

   [4]   The Court notes that this issue was decided in NTN
Bearing Corp. of America v. United States, 24 CIT at ___, ___, 104
F. Supp. 2d 110, 117-21 (2000). The reader is referred to NTN
Bearing for additional background information.

"deducting selling expenses associated with economic activities occurring in the United States, including commissions, direct selling expenses, indirect selling expenses, and repacking expenses in the United States"; (2) "deduct[ing] the cost of any further manufacture or assembly," where appropriate; and (3) "adjust[ing] for profit allocated to these expenses." Id. In particular, in adjusting CEP, Commerce deducted RHP-NSK's United States repacking expenses as direct selling expenses under § 1677a(d)(1)(B), rather than as moving expenses under § 1677a(c)(2)(A), because it determined that repacking "was performed on individual products in order to sell the merchandise to the unaffiliated customer in the United States." Final Results, 63 Fed. Reg. at 33,339.

### B. Contentions of the Parties

RHP-NSK argues, as it did in the Final Results, that Commerce erred in deducting RHP-NSK's United States repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B). See RHP-NSK's Mem. at 34-37. According to RHP-NSK, the United States repacking constitutes an expense incident to bringing the subject merchandise from the original place of shipment in the United Kingdom to the place of delivery in the United States and, therefore, should have been (1) classified and deducted as an

expense under § 1677a(c)(2)(A), and (2) excluded from the pool of selling expenses Commerce uses to determine CEP profit.  See id.

Specifically, RHP-NSK claims that § 1677a(c)(2)(A) is not limited to moving expenses, but includes expenses required for transporting the goods from RHP-NSK's United States warehouses into the hands of carriers for delivery to United States customers.  See RHP-NSK's Reply at 20.  RHP-NSK asserts that the cost of United States repacking is such a § 1677a(c)(2)(A) expense because the goods cannot be transported unless RHP-NSK first breaks open the transpacific shipping packages, selects the specific items ordered and then repacks those items for shipment to the customer's United States location.  See id. at 22.  RHP-NSK clarifies that this result does not change simply because the United States repacking may be directly related to particular sales.  See id. at 21.  RHP-NSK notes that § 1677a(c)(2)(A) does not preclude the deduction of expenses directly related to a particular sale; rather, the statute includes "any additional costs, charges, or expenses," either direct or indirect, incident to bringing the subject merchandise from Japan to the United States customer.  Id. (quoting § 1677a(c)(2)(A)).  RHP-NSK contends, for instance, that United States inland freight from its United States warehouse to United States unaffiliated customers, even though directly related to

particular sales to such customers, nevertheless constitutes a § 1677a(c)(2)(A) expense. <u>See id.</u> Thus, RHP-NSK asserts that United States repacking expense should similarly be treated as § 1677a(c)(2)(A) expenses even though it may be directly related to particular sales. <u>See id.</u>

Finally, RHP-NSK claims that United States repacking does not otherwise meet the definitional criteria of § 1677a(d)(1)(B) direct selling expenses such as credit expenses, guarantees and warranties. <u>See id.</u> RHP-NSK notes that such expenses assist in selling products, but do not involve transporting goods from the United Kingdom to the United States unaffiliated customer as do United States repacking expenses. <u>See id.</u> at 21-22.

Commerce responds, as it did in the <u>Final Results</u>, that RHP-NSK's United States repacking expenses bear no relationship to "moving the merchandise from one point to another," as established by the fact that the "merchandise was moved from the exporting country to the United States prior to repacking." Def.'s Mem. at 49 (quoting <u>Final Results</u>, 63 Fed. Reg. at 33,339). Commerce also contends that § 1677a(d)(1)(B) does not limit direct selling expenses deducted from CEP to credit expenses, guarantees or warranties; rather, the statute reduces CEP by the amount of any

selling expenses which result, and bear a direct relationship to, selling expenses in the United States. See id. at 50. Since RHP-NSK's repacking "'was performed on individual products in order to sell the merchandise to the unaffiliated customer in the United States,'" Commerce asserts that it properly treated the repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B). Id. (quoting Final Results, 63 Fed. Reg. at 33,339).

Torrington generally agrees with Commerce's arguments. See Torrington's Resp. at 31-34. Torrington notes, as it did in the Final Results, that RHP-NSK reported that it normally does not require repacking for its United States sales, but performed repacking "in order to sell the merchandise to the unaffiliated customer in the United States." Id. at 33. Torrington asserts that since RHP-NSK's response is consistent with Commerce's treatment of RHP-NSK's repacking expenses as selling rather than movement expenses, Commerce properly included RHP-NSK's repacking expenses in its calculation of CEP profit. See id. at 33-34.

C.   Analysis

The Court finds that RHP-NSK's United States repacking expenses were not incident to bringing the subject merchandise from the original place of shipment in the United Kingdom to the place

of delivery in the United States.  Rather, such expenses were clearly direct selling expenses.

Direct selling expenses under § 1677a(d)(1)(B) are not limited to credit expenses, guarantees and warranties, but include "expenses which result from and bear a direct relationship to the particular sale in question."  SAA at 823 (defining direct selling expenses).  In this case, the particular sales in question concerned orders for smaller distributors.  Although RHP-NSK reported that it normally does not perform repacking for United States sales (that is, it usually ships merchandise from its United States warehouse in its original containers), RHP-NSK acknowledged that it did some repacking to accommodate orders for smaller distributors.  See RHP-NSK's Resp. to Sect. C Questionnaire, Investigation No. A-412-801, Admin. Rev. 5/1/96-4/30/97, at 39 (Sept. 8, 1997).  The Court finds, therefore, as Commerce did in the Final Results, that RHP-NSK's repacking is an "expense associated with selling the merchandise."  63 Fed. Reg. at 33,339.

Accordingly, the Court concludes that Commerce properly treated and deducted RHP-NSK's United States repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B) rather than as transportation or other expenses pursuant to § 1677a(c)(2)(A).

## CONCLUSION

The Court finds that Commerce acted properly in: (1) failing to apply the special rule for merchandise with value added after importation under 19 U.S.C. § 1677a; (2) calculating profit for CV; (3) denying a partial, price-based LOT adjustment to NV; and (4) deducting United States repacking expenses as direct selling expenses. Commerce's determination is affirmed.

_____

NICHOLAS TSOUCALAS

SENIOR JUDGE

Dated:    November 2, 2000

          New York, New York